In the United States District Court
for the Eastern District of Michigan

| | |
|---|---|
| Sarah Bryant, | |
| *On behalf of herself and others similarly situated*, | Case No. |
| Plaintiff, | Judge |
| v. | Magistrate Judge |
| Domino's Pizza, Inc.; Domino's Pizza Franchising, LLC; and Domino's Pizza, LLC; | Jury Demand Endorsed Hereon |
| Defendants. | |

Collective Action Complaint

1.      Sarah Bryant, on behalf of herself and all similarly-situated individuals, brings this action against Defendants Domino's Pizza, Inc.; Domino's Pizza Franchising, LLC; and Domino's Pizza, LLC. Plaintiff seeks appropriate monetary, declaratory, and equitable relief based on Defendants' willful failure to compensate Plaintiff and similarly-situated individuals with minimum and overtime wages as required by the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA").

2.      According to its Annual Report published on January 2, 2022, Domino's Pizza, Inc., Domino's Pizza, LLC, and Domino's Pizza Franchising, LLC (collectively, "Domino's") is the largest pizza company in the world, which generated no less than $19.8 billion in delivery sales in the United States in 2021.

3.    Plaintiff worked as a delivery driver for Domino's store located at 90 W. William Street, Delaware, Ohio 43015 from approximately June 1, 2020 until approximately April 30, 2021.

4.    Domino's Pizza, Inc; Domino's Pizza Franchising, LLC and Domino's Pizza, LLC jointly employed Plaintiff and similarly-situated delivery drivers at at all times relevant.

5.    Domino's repeatedly and willfully violated the FLSA by improperly taking a tip credit from the wages of delivery drivers, and by failing to adequately reimburse delivery drivers for their delivery-related expenses, and thereby failing to pay delivery drivers the legally mandated minimum and overtime wage for all hours worked.

6.    All delivery drivers at Domino's stores, including Plaintiff, have been subject to the same employment policies and practices, including policies and practices with respect to wages, the tip credit, and reimbursement for out-of-pocket expenses.

7.    Plaintiff brings this action on behalf of herself and similarly situated current and former delivery drivers who elect to opt in pursuant to FLSA, 29 U.S.C. § 216(b) to remedy violations of the FLSA wage and hour provisions by Defendants.

**JURISDICTION AND VENUE**

8.    Under 28 U.S.C. § 1331 and 29 U.S.C. § 216(b), this Court has jurisdiction over Plaintiff's FLSA claims.

9.    Venue in this Court is proper under 28 U.S.C. § 1391(b) because Domino's Pizza, Inc.; Domino's Pizza Franchising, LLC; and Domino's Pizza, LLC are headquartered in Ann Arbor, Michigan, and a substantial part of the events giving rise to the claim herein occurred in this district.

**PARTIES**

**Plaintiff**

**Sarah Bryant**

10.     Plaintiff Sarah Bryant resides in Delaware, Ohio. Further, at all times material herein, Plaintiff worked for Domino's at its store located in Delaware, Ohio.

11.     Plaintiff was an "employee" of all of the Defendants as defined by the FLSA.

12.     Plaintiff has given written consent to join this action, a copy of which is attached to this Complaint as "**Exhibit A**".

**Defendants**

**Domino's Pizza, Inc.**

13.     Defendant Domino's Pizza, Inc. is a foreign corporation organized under the laws of the state of Delaware, with its principal place of business in Michigan.

14.     Domino's Pizza, Inc. is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA.

15.     Upon information and belief, Domino's Pizza, Inc. applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

16.     At all relevant times, Domino's Pizza, Inc. maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, and other practices.

17.     At all relevant times, Domino's Pizza, Inc. has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

3

18.     Domino's Pizza, Inc.'s gross revenue exceeds $500,000 per year.

**Domino's Pizza, LLC**

19.     Defendant Domino's Pizza, LLC is a foreign limited liability company organized under the laws of the state of Michigan.

20.     Domino's Pizza, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

21.     Domino's Pizza, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA.

22.     Upon information and belief, Domino's Pizza, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

23.     At all relevant times, Domino's Pizza, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, and other practices.

24.     At all relevant times, Domino's Pizza, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

25.     Domino's Pizza, LLC's gross revenue exceeds $500,000 per year.

**Domino's Pizza Franchising, LLC**

26.     Defendant Domino's Pizza Franchising, LLC is a foreign limited liability company organized under the laws of the state of Delaware, with its principal place of business in Michigan.

27.     Domino's Pizza Franchising, LLC is a wholly owned subsidiary of Domino's Pizza, Inc.

4

28.     Domino's Pizza Franchising, LLC is an "employer" of Plaintiff and similarly situated delivery drivers as that term is defined by the FLSA.

29.     Upon information and belief, Domino's Pizza Franchising, LLC applies or causes to be applied substantially the same employment policies, practices, and procedures to all delivery drivers at all of its locations, including policies, practices, and procedures relating to payment of minimum wages, overtime wages, and reimbursement of automobile expenses.

30.     At all relevant times, Domino's Pizza Franchising, LLC maintained control, oversight, and direction over Plaintiff and similarly situated employees, including, but not limited to, hiring, firing, disciplining, timekeeping, payroll, reimbursements, pay rates, and other practices.

31.     At all relevant times, Domino's Pizza Franchising, LLC has been and continues to be an enterprise engaged in "the production of goods for commerce" within the meaning of the phrase as used in the FLSA.

32.     Domino's Pizza Franchising, LLC's gross revenue exceeds $500,000 per year.

## LEGAL STANDARDS APPLICABLE TO DOMINO'S EXPENSE REIMBURSEMENT VIOLATIONS

33.     The FLSA prohibits any "kickback" of job-related expenses which would cut into the minimum wage or overtime otherwise required to be paid under the Act. Specifically, 29 C.F.R. § 531.35 provides:

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools

purchased by the employee cuts into the **minimum or overtime wages** required to be paid him under the Act. (emphasis added).

34.     Pizza delivery drivers' vehicle expenses are "tools of the trade." "In the pizza delivery context, the cost associated with delivering food for an employer is a 'kickback' to the employer that must be fully reimbursed, lest a minimum wage violation be triggered." *Hatmaker v. PJ Ohio*, LLC, No. 3:17-cv-146, 2019 WL 5725043, at *3 (S.D. Ohio Nov. 5, 2019); *see also, e.g.*, *Benton v. Deli Management, Inc*., 396 F.Supp.3d 1261, 1269-74 (N.D. Ga. Aug. 8, 2019) ("[Employer's] need for a vehicle is directly incidental to its business."); *Yu G. Ke v. Saigon Grill, Inc*., 595 F.Supp.2d 240, 258 (S.D.N.Y. Oct. 21, 2008) ("there is substantial legal authority for the proposition that mechanisms for transportation- typically motor vehicles-can be tools of the trade."); *Perrin v. Papa John's Int'l, Inc*., 114 F.Supp.3d 707, 729-30 (E.D. Mo. July 8, 2015) (denying summary judgment that fixed costs could be excluded from "tools of the trade").

35.     The relevant regulation governing such "kickbacks" does not define a methodology for calculating mileage rates or provide any other guidance as to how to determine or put a value on the expenses related to operating an automobile for work. *See* 29 C.F.R. § 531.35.

36.     In light of this ambiguity, Courts have adopted the methodology detailed in the Department of Labor's Field Operations Handbook. *See Hatmaker,* 2019 WL 5725043, at *6 (granting delivery drivers' motion for summary judgment); *see also Brandenburg v. Cousin Vinny's Pizza*, LLC, No. 3:16-cv-516, 2018 WL 5800594, *4 (S.D. Ohio Nov. 6, 2018) (granting Rule 23 class certification); *Brandenburg v. Cousin Vinny's Pizza, LLC*, 2019 WL 6310376, *1 (Nov. 25, 2019) (granting final approval of Rule 23 settlement and adopting DOL Handbook standard).

37.     Specifically, the DOL Handbook's rule is:

**30c15 Car expenses: employee's use of personal car on employer's business.** In some cases it is necessary to determine the costs involved when employees use their cars on their employer's business in order to determine minimum wage compliance. For example, car expenses are frequently an issue for delivery drivers employed by pizza or other carry-out type restaurants.

(a) As an enforcement policy, the IRS standard business mileage rate found in IRS Publication 917, "Business Use of a Car" may be used (in lieu of actual costs and associated recordkeeping) to determine or evaluate the employer's wage payment practices for FLSA purposes. The IRS standard business mileage rate (currently 28 cents per mile) represents depreciation, maintenance and repairs, gasoline (including taxes), oil, insurance, and vehicle registration fees. In situations where the IRS rate changes during the investigation period, the applicable rates should be applied on a prorate basis.

38.  "In the pizza delivery driver context, … determining and maintaining records of each employee's actual expenses is a cumbersome task for the employer." *Hatmaker*, 2019 WL 5725043, *3. As a result, the Handbook standard "giv[es] employers a choice in order to ease their burden: either (1) keep records of delivery drivers' actual expenses and reimburse for them or (2) reimburse drivers at the IRS standard business mileage rate." *Id.*

## LEGAL STANDARDS APPLICABLE TO DOMINO'S
## TIP CREDIT VIOLATIONS

39.    Under applicable law, in certain circumstances, it is permissible for an employer to take a tip credit and pay its employees less than the mandated minimum wage, provided that the employee's tips received from customers plus the cash wage paid by the employer equals at least the applicable minimum wage. However, in order to take advantage of these wage provisions, the employer must meet certain strict notification requirements.

40.    According to the Department of Labor's ("DOL") Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) ("Fact Sheet #15"):

the maximum tip credit that an employer can currently claim under the FLSA is $5.12 per hour (the minimum wage of $7.25 minus the minimum required cash wage of $2.13).

7

41.     As is made plain in Fact Sheet #15, in order to claim a tip credit, the employer must comply with five strict notification requirements.

42.     First, the employer must notify the employee of the amount of the cash wage the employer is paying the tipped employee and that amount must equal at least $2.13 per hour.

43.     Second, the employer must notify the tipped employee of the amount the employer is claiming as a tip credit. In accordance with the FLSA, the tip credit claimed cannot exceed $5.12 per hour.

44.     Third, the employer must inform the tipped employee that the tip credit claimed cannot exceed the actual amount of tips received by the employee. In effect, the employer must inform the employee that the employee must still earn the mandated minimum of $7.25 per hour between the amount of the tip credit taken by the employer and the amount of tips earned by the employee.

45.     Fourth, the employer must notify the tipped employee that all tips received are to be retained by the employee except for a valid tip pooling arrangement.

46.     Finally, the tipped employee must be informed by the employer that the tip credit will not apply unless the employee has been informed of these provisions.

47.     An employer bears the burden of showing that it has satisfied all of the notification requirements before any tips can be credited against the employee's hourly wage.[1] If an employer cannot demonstrate its compliance with this notification requirement, no credit can be taken and the employer is liable for the full minimum wage.

_____

[1] Courts have strictly construed this notification requirement. Accordingly, some courts have held that a generic governmental poster (which is required by the DOL) does not satisfy the tip credit notification requirement.

48.     Further, where a tipped employee earns less in tips than the tip credit claimed, the employer is required to make up the difference. Stated another way, if a tipped employee earns less than $5.12 per hour in tips (the maximum tip credit permissible where the employer pays the employee $2.13 per hour), the employer must raise that tipped employee's hourly cash component the necessary amount above $2.13 per hour so as to ensure that the employee earns at least $7.25 per hour – the mandated minimum wage.

49.     The tip credit may also be applied to an employer's overtime obligations. *See* 29 C.F.R. § 531.60. "To illustrate how this works, an employee working overtime must be paid $10.88 per hour—one and one-half times $7.25." *E.g. Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1033 (4th Cir. 2020). "The employer can still use the $5.12 tip credit but not more, meaning the hourly wage for overtime must be $5.76- $10.88 minus a $5.12 tip credit." *Id.*

## LEGAL STANDARDS APPLICABLE TO DEFENDANTS' STATUS AS "EMPLOYERS"

50.     Given the FLSA's sweeping definitional language, the Sixth Circuit has recognized that the statute "contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA." *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991). In addition, "[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Dole*, 942 F.2d at 965 (internal quotation marks and citation omitted). More specifically, "[i]n deciding whether a party is an employer, 'economic reality' controls rather than common law concepts of agency." 942 F.2d at 965 (citation omitted). Finally, "[w]hether a party is an employer within the meaning of the FLSA is a legal determination." 942 F.2d at 965.

51.     "Under the 'single employer' or 'integrated enterprise' doctrine, two companies may be considered so interrelated that they constitute a single employer subject to liability under"

federal law. *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997). "In determining whether to treat two entities as a single employer, courts examine the following four factors: (1) interrelation of operations, i.e., common offices, common record keeping, shared bank accounts and equipment; (2) common management, common directors and boards; (3) centralized control of labor relations and personnel; and (4) common ownership and financial control." *Id.* at 993-94; *see also Benion v. LeCom, Inc.*, 336 F. Supp.3d 829, 846-47 (E.D. Mich. 2018); *Sutton v. Community Health Systems, Inc.*, 2017 U.S. Dist. LEXIS 133712, 2017 WL 3611757, at *3-*4 (W.D. Tenn. Aug. 22, 2017); *Lankford v. CWL Investments, LLC*, 2014 U.S. Dist. LEXIS 111929, 2014 WL 3956184, at *10 (E.D. Mich. Aug. 13, 2014); *Sierra v. Casa Fiesta, LLC,* 2014 U.S. Dist. LEXIS 200783, 2014 WL 12586059, at *3 (E.D. Mich. June 13, 2014); *Takacs v. Hahn Automotive Corp.*, 1999 U.S. Dist. LEXIS 21691, 1999 WL 33117265, at *4-*5 (S.D. Ohio Jan. 4, 1999).

52.     In addition to the "single employer" or "integrated enterprise" doctrine, two or more companies may be liable under the FLSA as "joint employers." "[T]he FLSA does not distinguish between employers and joint employers. Any factor that is relevant to whether an entity is an employer is also relevant to whether the entity is a joint employer." *New York v. Scalia*, 490 F Supp. 3d. 748, 790 (S.D.N.Y. Sept. 8, 2020). Historically, 29 C.F.R. § 791.2 has explained that:

> (a) A single individual may stand in the relation of an employee to two or more employers at the same time under the Fair Labor Standards Act of 1938 . . . . [I]f the facts establish that the employee is employed jointly by two or more employers, i.e., that employment by one employer is not completely disassociated from employment by the other employer(s), all of the employee's work for all of the joint employers during the workweek is considered as one employment for purposes of the Act. In this event, all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the act . . . with respect to the entire employment for the particular workweek. . . .
>
> (b) Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the

workweek, a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees; or

(2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or

(3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer. 29 C.F.R. § 791.2 (effective though March 15, 2020) (presently repealed and reserved).

## FACTS

### COLLECTIVE-WIDE FACTUAL ALLEGATIONS

53.    At all relevant times, Defendants have failed to pay Plaintiff and similarly situated delivery drivers the legally required minimum wage and overtime wages because they failed to adequately reimburse them for their automobile expenses or other job-related expenses.

54.    Plaintiff and similarly situated delivery drivers typically average approximately five miles per round-trip delivery.

55.    According to the Internal Revenue Service, the standard mileage rate for the use of a car during the relevant time periods have been:

- a.    2019: 58 cents/mile
- b.    2020: 57.5 cents/mile
- c.    2021: 56 cents/mile
- d.    2022: 58.5 cents/mile

56.    Prices for gasoline in 2022 have increased by more than 50% compared to what they were a calendar year ago in 2021. https://www.cnbc.com/2022/05/31/gas-prices-and-inflation-overtake-covid-as-top-travel-worry-.html (last visited Jun. 1, 2022)

57.    Plaintiff and similarly situated delivery drivers are also required to purchase Domino's branded apparel.

11

58.     As a result of the automobile and other job-related expenses and deductions incurred by Plaintiff and other similarly situated delivery drivers, they were deprived of minimum wage and overtime wages guaranteed to them by the FLSA.

59.     At all relevant times, Defendants apply the same pay policies, practices, and procedures to all delivery drivers at all Domino's restaurants.

60.     All of Defendants' delivery drivers had similar experiences to those of Plaintiff. They were paid tipped minimum wage for all hours worked, were subject to the same reimbursement policy; received similar reimbursements; incurred similar automobile expenses; and completed deliveries of similar distances and at similar frequencies.

61.     For example, all delivery drivers at all Domino's stores nationwide are required to provide their own vehicle to deliver Defendants' pizzas and related food products and beverages.

62.     Defendants have never kept track of the actual vehicle related expenses incurred by delivery drivers at any of Domino's stores nationwide.

63.     Defendants suffer or permit Domino's delivery drivers to receive a flat rate per delivery reimbursement which is often as little as $1.00 per delivery.

64.     Regardless of the precise amount of the per-delivery reimbursement at any given point in time, the Defendants' reimbursement policies have resulted in an unreasonable underestimation of delivery drivers' automobile expenses throughout, causing systematic violations of the federal minimum wage and overtime wage requirements.

65.     Defendants likewise have a company policy of failing to insure that its delivery drivers are properly notified and informed of all of the legal requirements which must be met in order to take a tip credit against delivery drivers' wages.

66.     Despite many of Domino's delivery drivers earning less than federal or state minimum wage, Defendants do not inform Domino's delivery drivers that as tipped employees, their cash wage must be equal to at least $2.13 per hour.

67.     Despite many of Domino's delivery drivers earning less than federal or state minimum wage, Defendants do not inform Domino's delivery drivers that Defendants will be taking a tip credit against their wages not to exceed $5.12 per hour.

68.     Despite many of Domino's delivery drivers earning less than federal or state minimum wage, Defendants do not inform Domino's delivery drivers that the tip credit claimed cannot exceed the actual amount of tips received by the employee. Defendants do not inform Domino's delivery drivers that they must still earn the mandated minimum of $7.25 per hour between the amount of the tip credit taken by the employer and the amount of tips earned by the employee.

69.     Despite many of Domino's delivery drivers earning less than federal or state minimum wage, Defendants do not inform Domino's delivery drivers that all tips received are to be retained by the employee except for a valid tip pooling arrangement.

70.     Despite many of Domino's delivery drivers earning less than federal or state minimum wage, Defendants do not inform Domino's delivery drivers that the tip credit will not apply unless the employee has been informed of these provisions.

71.     Moreover, by making their delivery drivers pay for job-related expenses as described herein, Domino's does not ensure that its delivery drivers retain all of their tips, thereby forfeiting Domino's ability to take a tip credit against their delivery drivers' wages.

72.     Defendants are well aware of the minimum wage and overtime requirements of the FLSA as they have been named as defendants in numerous similar lawsuits, including a similar

13

nationwide collective action brought against Domino's Pizza, LLC over a decade ago. *See e.g.* *Luiken v. Domino's Pizza, LLC*, Case No. 0:09-cv-00516 (D. Minnesota).

73.     By failing to adequately reimburse Domino's delivery drivers for job-related expenses as described herein, Defendants have willfully violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206.

74.     By failing to adequately reimburse Domino's delivery drivers for job-related expenses as described herein, in instances in which a Domino's delivery driver worked in excess of forty hours in any given workweek, Defendants violated the overtime provisions of the FLSA, 29 U.S.C § 207(a).

75.     By failing to adhere to the tip credit requirements of the FLSA, but nonetheless taking a tip credit against the delivery drivers' wages, Domino's willfully violated the minimum wage provisions of the FLSA, 29 U.S.C § 206.

76.     By failing to adhere to the tip credit requirements of the FLSA, but nonetheless taking a tip credit against hours in which the delivery drivers worked in excess of forty hours in a given workweek, Domino's willfully violated the overtime requirements of the FLSA.

**PLAINTIFF'S INDIVIDUAL FACTUAL ALLEGATIONS**

77.     Consistent with their policies, patterns, and practices as described herein, Defendants harmed Plaintiff, individually, as follows:

78.     Plaintiff worked as a delivery driver for Domino's Pizza located at 90 W. William Street, Delaware, Ohio 43015 from approximately June 1, 2020 through approximately April 30, 2021.

79.     Domino's required Plaintiff to maintain and pay for an operable, safe, and legally compliant automobile to use in delivering pizza.

14

80.     Plaintiff was required to purchase gasoline, oil and other fluids, vehicle parts, auto repair and maintenance parts and services, and auto insurance for the benefit of Domino's.

81.     Plaintiff's car depreciated in value as a result of the work she completed for Domino's.

82.     Domino's never attempted to track how much money Plaintiff was paying out of pocket in order to make deliveries on their behalf.

83.     Domino's never required, requested or permitted Plaintiff to record or report the expenditures she made for her car, gasoline, and/or for other job-related expenses.

84.     At all relevant times in her work for Defendants, Plaintiff received a flat delivery reimbursement amount of approximately $1.00 for each delivery she completed. This reimbursement rate was the same no matter how many miles she drove.

85.     Plaintiff drove approximately 5 miles per delivery during her employment at Domino's.

86.     Thus, Defendants' average effective reimbursement rate for Plaintiff was approximately $.20 per mile ($1.00 per delivery / 5 average miles per delivery).

87.     In 2020, the IRS mileage reimbursement rate was 57.5 cents per mile. As such, in 2020, Domino's under reimbursed Plaintiff approximately 37.5 cents per mile and $1.88 per delivery.

88.     In 2021, the IRS mileage reimbursement rate was 56 cents per mile. As such, in 2021, Domino's under reimbursed Plaintiff approximately 36 cents per mile and $1.80 per delivery.

89.     Plaintiff was also required to purchase Domino's branded apparel, which caused her effectively hourly wage rate to drop below minimum wage.

90.     For example, when Plaintiff began her employment for Domino's she was issued only two Domino's branded short-sleeved polos and a Domino's branded baseball cap. If Plaintiff required any other clothing to adequately comply with Defendant's company-wide appearance and attire requirements, Plaintiff had to purchase such clothing with the wages that Defendants otherwise owed to her.

91.     For example, during the cold weather months, the short-sleeved shorts issued to Plaintiff were obviously insufficient. However, Defendants required Plaintiff to wear Domino's branded apparel at all times. As such, Plaintiff was required to purchase a Domino's branded winter jacket using the wages and/or tips which were otherwise owed to Plaintiff.

92.     At all relevant times during her employment Domino's paid Plaintiff an hourly wage between $5.00 and $5.25 per hour for all time spent delivering for Defendants.

93.     In 2020, the Ohio minimum wage was $8.70 per hour and the Federal minimum wage was $7.25. In 2021, the Ohio minimum wage was $8.80 per hour and the Federal minimum wage remained $7.25.

94.     As such, at all relevant times, Domino's paid Plaintiff less than the full applicable state and federal minimum wage, taking a "tip credit" against her wages to make up the difference.

95.     Despite taking a tip credit against Plaintiff's wages, Defendants failed to inform Plaintiff that her cash wage had to be at least the federally mandated $2.13 per hour.

96.     Despite taking a tip credit against Plaintiff's wages, Defendants failed to inform Plaintiff that the amount of the tip credit could never exceed $5.12 per hour.

97.     Despite taking a tip credit against Plaintiff's wages, Defendants failed to inform Plaintiff that she must always earn at least $7.25 per hour between the amount of tips received and the amount of the tip credit taken against her wages.

16

98.     Despite taking a tip credit against Plaintiff's wages, Defendants failed to inform Plaintiff that all tips received must be retained by Plaintiff except for in a valid tip pooling arrangement.

99.     In fact, by requiring Plaintiff to purchase Domino's branded apparel and pay for all vehicle-related expenses as detailed herein, Defendants did not permit Plaintiff to retain all tips received.

100.    Despite taking a tip credit against Plaintiff's wages, Defendants failed to inform Plaintiff that no tip credit could be taken if she was not informed of the of the tip credit requirements of the FLSA.

101.    Plaintiff regularly worked in excess of forty hours in a given workweek during her employment at Domino's.

102.    For example, during the pay period spanning from October 5, 2020 through October 18, 2020, Plaintiff worked 4.35 hours of overtime as a driver. Domino's took a tip credit against Plaintiff's wages for these 4.35 hours of overtime.

103.    By failing to adequately reimburse Plaintiff for job-related expenses as described herein, Defendants have willfully violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206.

104.    By failing to adequately reimburse Plaintiff for job-related expenses as described herein, in instances in which Plaintiff worked in excess of forty hours in any given workweek, Defendants violated the overtime provisions of the FLSA, 29 U.S.C § 207(a).

105.    By failing to adhere to the tip credit requirements of the FLSA, but nonetheless taking a tip credit against Plaintiff's wages, Domino's willfully violated the minimum wage provisions of the FLSA, 29 U.S.C § 206.

106.    By failing to adhere to the tip credit requirements of the FLSA, but nonetheless taking a tip credit against hours in which Plaintiff worked in excess of forty hours in a given workweek, Domino's willfully violated the overtime requirements of the FLSA.

### FACTS PERTAINING TO DEFENDANTS' STATUS AS "EMPLOYERS"

107.    At all relevant times, Domino's Pizza, Inc.; Domino's Pizza Franchising, LLC; and Domino's Pizza, LLC employed Plaintiff and similarly situated employees as both "single employers" and "joint employers".

108.    A district court within the Sixth Circuit recently held that it was plausible that Domino's Pizza, Inc.; Domino's Pizza Franchising, LLC; and Domino's Pizza, LLC are liable for FLSA violations as joint employers despite the existence of a franchisee entity having ownership of the particular store at which the named Plaintiff worked. *See Clark v. Pizza Baker*, Case No. 2:18-cv-00157, 2019 U.S. Dist. LEXIS 161623 *25-31 (S.D. Oh. Sept. 23, 2019).

**Defendants' Organizational Structure**

109.    Domino's Inc. is a publicly traded company, listed on the New York Stock Exchange.

110.    Domino's Pizza Franchising, LLC and Domino's Pizza, LLC are both wholly owned subsidiaries of Domino's Pizza, Inc.

111.    Conversely, Domino's Pizza, Inc. is the parent corporation of both Domino's Pizza Franchising, LLC and Domino's Pizza, LLC.

112.    According to Domino's Annual Report for 2022, the enterprise operates and reports in the United States on three methodologies: (1) corporate owned stores; (2) franchised stores; and (3) supply chain.

113.    All Defendants share a common goal of maximizing profitability, dividends, and asset value to Domino's Pizza, Inc.'s shareholders.

114.    According to Domino's Annual Report for 2016, it is the number one pizza delivery chain in the United States, holding approximately 28% of the total market share for pizza delivery.

115.    Upon information and belief, enterprise strategic decision making occurs at the top-corporate level by Domino's Pizza, Inc.

116.    Upon information and belief, Domino's Pizza, LLC is the arm which cascades corporate directives across the supply-chain business segment, including but not limited to, raw materials, product and service offerings, technological innovations and enterprise-wide synergies.

117.    Upon information and belief, Domino's Pizza Franchising, LLC is the arm which cascades corporate directives across the franchise business segment, including but not limited to, royalties and other franchise fees, required franchise advertising contributions, franchise development and growth, and franchise compliance with corporate directives.

118.    Domino's prides itself in being the revenue leader in pizza delivery sales in the United States.

119.    Domino's exercises substantial control over Plaintiff and similarly situated delivery drivers, both directly and indirectly.

120.    Domino's has the power to curtail the unlawful policies, patterns and/or practices alleged herein, but has refrained from doing so in order to continue to reap the profits from the franchise relationship.

121.    Domino's has a clear and direct interest in franchise stores minimizing labor costs to increase profitability—even if it means minimizing labor costs below state and federal

minimums—particularly if they are permitted to collect profits while also being insulated from legal liability.

**Domino's has a Financial Interest in all of it's Locations**

122.   As of January 2, 2022, 6,185 Domino's stores in the United States operated according to Domino's franchise model. By contrast, only 375 Domino's stores are "company owned." In other words, over 94% of Domino's stores in the United States operate according to the Domino's franchise model.

123.   Domino's admits to applying "rigorous standards to prospective U.S. franchisees." Domino's generally requires any franchisee to manage a store for at least one year. Domino's additionally requires any franchisee to graduate from Domino's franchise management school.

124.   In fact, "substantially all" of Domino's franchisees started their careers with Domino's as delivery drivers or in other in-store positions. Domino's characterizes this as "an internally based franchise system." https://biz.dominos.com/about-us/franchising/ (last visited June 2, 2022). Domino's does not currently offer franchise opportunities to anyone not already employed within the Domino's enterprise. *Id.*

125.   Moreover, as part of Domino's Standard Franchise Agreement ("SFA"), its franchisees are restricted from being involved in other businesses, which Domino's states "helps focus our franchisees' attention on operating their stores."

126.   Domino's SFA requires its franchisees to pay 5.5% of all sales to Defendants as a "royalty."

127.   Additionally, Domino's SFA requires franchisees to pay "certain technology fees" to use Defendants' enterprise-wide platforms.

128.    Additionally, Domino's SFA requires its franchisees to pay 6% of all sales to Defendants to fund national advertising campaigns. Under the SFA, Domino's may also use this money "to support market research, field communications, public relations, commercial production, talent payments and other activities to promote the Domino's brand."

129.    In other words, Defendants collect no less than 11.5% of all gross revenue generated at all of their franchise locations.

130.    By contrast, Defendants use their relatively few "company owned" stores primarily as "as test sites for technological innovation and promotions as well as operational improvements. . . for training new store managers and operations team members, as well as developing prospective franchisees."

131.    Under the SFA, Defendants also retain the right to "terminate a franchise agreement for a variety of reasons, including, but not limited to, a franchisee's failure to adhere to the Company's franchise agreement, failure to make required payments, or failure to adhere to specified Company policies and standards."

132.    Defendants' supply chain segment accounted for $2.56 billion, or 59%, of Domino's consolidated revenues in 2021.

133.    Defendants operate 21 supply chain facilities across the United States which Defendants use to supply the dough and other ingredients which Domino's uses to serve its customers at Defendants' franchise stores.

134.    In other words, in addition to the 11.5% of gross receipts that are kicked up to Defendants under the SFA, Defendants have its stores purchase their necessary inventory from Domino's supply chain.

135. Defendants, in turn, offer "profit sharing" with its franchise locations whereby 50% of the pre-tax profit generated from Defendants'' supply chain is shared with the franchises.

136. Defendants' business model has parallels to a pyramid scheme. Defendants recruit delivery drivers, to become store managers. Defendants recruit store managers to become franchisees. Defendants "sell" the necessary raw materials for creating all of Domino's uniform menu offerings which are sold to Defendants' customers nationwide, generating further revenue. Defendants, at the top, get their taste of the proverbial pie from the operations at all of their locations.

**Domino's Indirectly Exercises Control Over Delivery Drivers by Controlling Franchisees**

137. Domino's' Standard Franchise Agreement requires franchisees to adhere to the "Domino's System," which requires stores to "conduct business under a uniform business format, with specially designed equipment, computer hardware and software designated by us, and specifications for the preparation and sale of pizza and certain authorized food products."

138. Adherence to the Domino's System is required, and failure to comply with Domino's policies and procedures can and does result in a franchise's termination.

139. Through the Domino's System, Domino's controls the actual labor needs of franchise stores, labor budget and allocation for franchise stores, employees' job duties at franchise stores, behavioral policies and procedures at franchise stores, employee training at franchise stores, supply of food, products, and training at franchise stores, advertising and marketing at franchise stores, and the overall operational system and budget of franchise stores, including the JWG restaurants and the Rolling in the Dough restaurants.

140.    Domino's' 800-page Manager's Guide is a "veritable bible for overseeing a Domino's operation … that literally leaves nothing to chance." *Parker v. Domino's, Inc.*, 629 So. 2d 1026, 1028-29 (Fla. App. 4th Dist. 1993).

141.    In addition to the Manager's Guide and hundreds of other operational materials provided by Domino's, franchise stores are required to purchase, install, and use Domino's PULSE operating system. PULSE is a comprehensive operating system, used for point-of-sale functions, and for recording employees' worktime using individual employee codes, tracking employee work tasks continuously, recording tips, tracking pizza delivery information, maintaining personnel data, monitoring store hours and product prices, and generating sales, revenue, and payroll reports.

142.    PULSE is used in all "company owned" and franchise stores in the United States.

143.    Domino's "believe[s] utilizing Domino's PULSE with our integrated technology solutions throughout our system provides us with competitive advantages over other concepts."

144.    Franchises are contractually obligated to provide Domino's full access to their business information; therefore Domino's has constant, real-time access to all information stored in PULSE in any franchise store nationwide, and reviews certain aspects of that information from all its stores daily.

145.    PULSE tracks, minute-by-minute, all tasks completed after an order is received, and which employee completes each task.

146.    Domino's uses the PULSE system to monitor employee activity.

147.    The PULSE Labor Tools use each store's historical menu mix and sales data to determine what type of employees need to be staffed where, and for how long.  The PULSE system

23

and corporate policy dictates to franchisees exactly how many workers they should have depending on PULSE's precise measurements of workload.

148.    The PULSE Payroll Report is to be used for viewing payroll information, including clock-in and clock-out times, and generating payroll information to give to your accountant or payroll service.

149.    Franchise stores are required to adhere to Domino's' conditions regarding property leases and the layout and aesthetic of store itself.

150.    Domino's must approve of all franchisee leases.  Leases have to conform with Domino's requirements for its corporate owned locations.

151.    All Domino's stores have been required to convert the physical layout of the store to the "Pizza Theater" design created by Domino's corporate.

152.    According to Domino's, the Pizza Theater is designed to minimize costs relating to staffing.

153.    By monopolizing the supply chain, Domino's allows franchisees even less flexibility in allocating their budget.

154.    Domino's digital ordering and marketing platforms have also changed the way employees spend their time while working at franchise stores.

155.    In 2010, Domino's decided to develop their own online ordering platform to manage this important and growing area of their business internally.

156.    Franchise stores are required to accept orders over Domino's digital platforms and are not permitted to opt out of Domino's digital ordering platforms.

157.    More than half of all Domino's global retail sales in 2021 from digital channels. In the United States, Domino's developed several innovative ordering platforms, including those for Google Home, Facebook Messenger, Apple Watch, Amazon Echo, and Twitter.

158.    In 2019, Domino's announced a partnership with Nuro to further its exploration and testing of autonomous pizza delivery. In other words, Defendants are investing in technological innovations which would further reduce or eliminate the labor cost of the very delivery drivers which are the subject of this Complaint.

159.    Domino's' digital ordering platforms directly influence the terms and conditions of employment at Domino's franchise stores.  With over fifty percent of orders being placed online without the assistance of an in-store employee, franchise employees' job duties and time at work can and have been re-allocated to other tasks.

160.    Domino's sets employee standards and enforces those standards through regular communications with franchisees and in-person inspections throughout the year.

161.    Domino's goes beyond the supervision of food quality, instead engaging in co-supervision or co-management of everyday store operations and employee activities.

162.    Domino's utilizes "regional franchise teams" which are responsible for "distributing materials that help franchise stores comply with our standards and using franchise advisory groups that facilitate communications between us and our franchisees."

163.    Domino's Franchise Operations personnel provide guidance and supervision to franchise employees through on-site visits and instructions.

164.    According to Domino's, at least three times per year, Domino's conducts site inspections of franchise stores, called Operations Evaluations Reports.  A Domino's Evaluation

inspector makes an unannounced visit to each store, assessing every aspect of store operations, and awarding it a score from 0 to 100 for compliance with Domino's standards.

165.    Franchise stores who receive low Evaluation scores are given a Notice of Default and required to submit an action plan to Domino's Area Leaders.  If a franchisee receives three Notices of Default in one year, the franchise can be terminated even if the defaults were corrected.

166.    In addition to Evaluations, Area Leaders regularly make unannounced visits to franchise stores.

167.    Domino's has the power to terminate franchise agreements based on "failure to adhere to specified Company policies and standards."  Upon information and belief, those specified policies and standards include failure to operate the store in full compliance with applicable wage-and-hour laws, or to engage in conduct that adversely affects the Domino's brand and the goodwill of Domino's trademarks.  Therefore, Domino's is ultimately able to control how its franchisees operate, and could have terminated SOP's franchise agreements due to their systematic failure to obey federal and state labor laws.

168.    By mandating the franchise stores operate on a shoestring budget according to their own detailed policies and guidelines, Domino's controls the terms and conditions of Plaintiff's employment and the employment of similarly situated delivery drivers.

**Domino's Directly Controls Delivery Drivers**

169.    Domino's exercises substantial direct control over Plaintiff and similarly situated delivery drivers.

170.    Delivery driver job positions for franchise stores are posted on the Domino's corporate website, www.dominos.com, and contain similar language to the delivery driver position

postings for Domino's corporate stores.   The job posting identifies specific job duties and minimum requirements for the job, which are nearly identical across all Domino's stores.

171.    Domino's mandates that applicants undergo a background check before they can be hired at franchise stores.

172.    Domino's requires background checks upon hire and at every third anniversary for employees in both corporate and franchise stores.

173.    Domino's requires these background checks to be conducted by one of four pre-determined background check agencies, and themselves mandate the process and criteria for a passable background check, with no input from franchisees.

174.    Domino's background check agencies provide franchisees with a "meets/does not meet" answer for each job applicant, precluding franchisees from considering individual circumstances, or setting the criteria for employment in the first place.

175.    If an applicant meets Domino's criteria and makes it through the door at a franchise store, their job performance is thereafter measured by reference to standards and metrics laid out by Domino's.

176.    Domino's creates, designs, builds and updates all training and development programs for its franchisees and employees.

177.    The distances travelled by Plaintiff and similarly situated delivery drivers per delivery is directly decreed by Domino's.

178.    Domino's SFA assigns an exclusive area of primary responsibility to each franchised store.   Said differently, Domino's determines the delivery radius for each store.

179.    Pursuant to the SFA, franchise stores are not permitted to modify their delivery radius without seeking approval from Domino's.

180.    Domino's SFA provides that Domino's will proscribe procedures and standards under which franchisees are to determine, on an annual basis, whether certain delivery areas might present a danger to employees.

181.    Domino's exercises significant control over the scheduling and workload of franchise employees.

182.    Section 12 of the Manager's Guide sets mandatory minimum scheduling and staffing rules for all franchise stores which play a significant role in determining scheduling of those stores' employees.

183.    Domino's corporate employees provide franchisees with instructions on how to schedule, including, *e.g.*, to adjust schedules based on PULSE reports regarding delivery times, to "cross train" drivers on in-store tasks to make it possible to schedule more drivers and fewer in-store employees, to schedule enough delivery drivers to eliminate "triples," or deliveries of three different orders during a single delivery run, and to schedule employees in regular 15-minute increments.  These types of directives have a direct impact on the employment of Plaintiff and similarly situated delivery drivers.

184.    By eliminating "triples," for example, Domino's restricts Plaintiff and other delivery drivers' income because they drive longer distances and times to collect the same tips and per delivery reimbursement payments.

185.    Company policy dictates that delivery drivers complete their deliveries within 30 minutes of the order being placed.  Franchise stores are critiqued based on whether orders were delivered "on-time."

186.    Section 12 of the Manager's Guide standards directly impacts franchisee employees' compensation by prohibiting tip jars in franchise stores.

187.     Domino's has strict and specific requirements about employee appearance, requiring that employees shave daily, specifying the permitted hair length, restricting piercings and earrings, tattoos, sock and undershirt colors, and uniforms to be worn by employees at franchise stores.

188.     The Manager's Guide mandates that delivery drivers, including those at franchise stores, may not carry more than $20 with them during deliveries.  Domino's has used this policy to place a franchisee in "default."

189.     Domino's also exercises control over discipline and termination decisions. Domino's reserves the right to terminate a franchise if they refuse to comply with Domino's' directives to terminate or discipline an employee.

190.     Domino's promotes an anti-union policy to its franchisees, and takes active steps from preventing franchisee employees from creating a union.

191.     Specifically, Domino's distributes their own internal union avoidance materials to franchisees, and its HR Director and legal team advise franchisees on how to prevent union activity.   Domino's own head of Human Resources and outside labor counsel have met and consulted with franchise owners regarding potential union activity.

192.     In response to some union activity, Domino's distributed materials stating that "There is no union at Domino's, and the company does not want a union here. We will do everything legally possible to keep a union out."

193.     By restricting or attempting to restrict employees' ability to unionize, Domino's is exercising direct control over franchisee employees.

194.    Domino's is directly involved in customer and employee complaints at franchise stores.  Domino's Customer Care Center allows customers and employees to complain directly to Domino's.

195.    Domino's maintains employment records for franchise stores.  PULSE contains employees' clock in/out information, first and last names, descriptions and times spent on various job tasks and other timekeeping data for employees, wage rates, tips reported by drivers, and mileage calculations that could be used to reimburse delivery drivers for delivery expenses. Domino's has total access to this data, and accesses it daily.

**Domino's Ignored and Profited from the Wage Violations**

196.    Domino's' franchise model has been heavily scrutinized for decades.

197.    On May 23, 2016, the Attorney General of the State of New York accused Domino's of many of the same wage violations Plaintiff alleges herein, and also fraud relating to Domino's' failure to inform its franchisees of wage-related "defects" in the PULSE system. *Petition*, *People v. Domino's Inc., et al.* (Sup. Ct. New York County May 23, 2016) (No. 450627-2016).

198.    Domino's SFA prohibits franchises from hiring employees from other Domino's locations without prior approval from Defendants in an effort to keep labor costs down across the entire enterprise.

199.    Domino's has meticulously reviewed and monitored its PULSE systems, and all of its programs and materials for use in its stores.  On a semi-annual basis, Domino's notifies franchisees of various changes and adjustments that have been made to the PULSE system.

200.    Domino's has notified franchisees of hundreds of issues and/or improvements to PULSE over the years, however they have been noticeably silent when a PULSE "defect" results in low-level employees, such as delivery drivers, to be underpaid.

201.    For example, Domino's has been aware since 2007 that the PULSE system does not permit entry of more than one wage rate for the same employee, resulting in delivery employees impermissibly being subjected to the tip credit.  Also, since 2007, Domino's has been aware that PULSE calculates tip credit overtime wages at the wrong rate.

202.    However, despite knowledge of the wage and hour issues created by using PULSE for payroll since 2007, Domino's did nothing to notify franchisees of any problems until May 2015, when they inserted a two-sentence advisement to franchisees tucked within the 800-page Manager's Guide that PULSE was not meant to be a payroll system.

203.    Just as Domino's' supply chain is "vertically integrated," so too are the labor policies that relate to Plaintiff and similarly situated delivery drivers.

204.    Domino's has been aware and/or should have been aware of the wage and hour violations alleged herein, and has at all times had the authority to stop them from happening.

205.    In fact, Domino's informed its shareholders in its 2022 Annual Report that:

[W]e may be subject to employee, franchisee and other claims in the future based on, among other things, discrimination, harassment, working and safety conditions, wrongful termination and wage, expense reimbursement, rest break and meal break issues, including claims relating to overtime compensation. We have been and continue to be subject to these types of claims. If one or more of these claims were to be successful or if there is a significant increase in the number of these claims or if we receive significant negative publicity, our business, financial condition and operating results could be harmed.

## COLLECTIVE ACTION ALLEGATIONS

206.    Plaintiff brings the First Count and Second Count of this Complaint on behalf of the following individuals (hereafter "the Delivery Expenses Collective"):

All current and former delivery drivers employed at any Domino's Pizza location nationwide and paid a flat per-delivery rate as vehicle-related expense reimbursement at any point during the three years prior to the filing of this Complaint and the date of final judgment in this matter, who elect to opt-in to this action.

207.    Plaintiff brings the Third and Fourth Count of this Complaint on behalf of the following individuals (hereafter "the Tip Credit Collective"):

All current and former delivery drivers employed at any Domino's Pizza location nationwide and were paid an hourly wage of less than $7.25 per hour at any point during the three years prior to the filing of this Complaint and the date of final judgment, who elect to opt-in to this action.

208.    At all relevant times, Plaintiff and the FLSA Collectives have been similarly situated, have had substantially similar job duties, requirements, and pay provisions, and have all been subject to Defendants' decision, policy, plan, practices, procedures, protocols, and rules of willfully refusing to pay Plaintiff and the FLSA Collectives minimum wage and overtime for all hours worked.  Plaintiff's claims are essentially the same as those of the FLSA Collectives.

209.    Defendants' unlawful conduct is pursuant to a corporate policy or practice of minimizing labor costs by failing to properly pay Plaintiff and the FLSA Collectives.

210.    Defendants are aware or should have been aware that federal law required them to pay employees minimum wage for all hours worked.

211.    Defendants are aware or should have been aware that federal law required them to reimburse delivery workers for expenses relating to "tools of the trade," such as, among other things, automobile costs and gasoline for delivery drivers.

212.    Defendants are aware or should have been aware that federal law prohibited them from taking "kickbacks" from the wages of delivery drivers.

213.    Defendants are aware or should have been aware that federal law prohibited them from taking a tip credit against the wages of their delivery drivers without first adhering to all of the tip credit notice requirements of the FLSA.

214.    Defendants are aware or should have been aware that federal law prohibited them from taking a tip credit against the wages of their delivery drivers when Defendants did not mandate that their delivery drivers retain all tips received.

215.    Defendants' unlawful conduct has been widespread, repeated, and consistent.

216.    This action is properly brought under and maintained as an opt-in collective action under 29 U.S.C. § 216(b).

217.    The FLSA Collectives members are readily identifiable and ascertainable.

### CAUSES OF ACTION

### Count One
### Fair Labor Standards Act – Minimum Wage Violation
### On behalf of Plaintiff and the Delivery Expenses Collective

218.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

219.    Plaintiff and the Delivery Expenses Collective are or were non-exempt, hourly employees entitled to receive no less than minimum wage for all hours worked.

220.    The minimum wage requirements of the FLSA will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of

the Act in any workweek when the cost of such tools purchased by the employee cuts into the **minimum** or overtime **wages**. 29 C.F.R. § 531.35 (emphasis added).

221. It is well established that, in the pizza delivery context, employers have two options to comply with the minimum wage directives of the FLSA: either (1) keep records of delivery drivers' actual expenses and reimburse for them or (2) reimburse drivers at the IRS standard business mileage rate." *Hatmaker*, 2019 WL 5725043, *3 citing DOL Field Operations Handbook 30c15.

222. At all relevant times, Plaintiff and the Delivery Expenses Collective were required to provide their own vehicle to deliver Defendants' pizzas and related food products and beverages.

223. At all relevant times, Defendants never kept track of the actual vehicle related expenses incurred by Plaintiff and the Delivery Expenses Collective.

224. At all relevant times, Defendants suffered or permitted Plaintiff and the Delivery Expenses Collective to receive a flat rate per delivery reimbursement which is often as little as $1.00 per delivery.

225. At all relevant times, Defendants suffered or permitted Plaintiff and the Delivery Expenses Collective to purchase Domino's branded apparel for the purpose of complying with Defendants' enterprise-wide attire and appearance policy.

226. As a result of the forgoing actions, Defendants have violated the minimum wage provisions of the FLSA, 29 U.S.C § 206.

227. Defendants are well aware of the minimum wage requirements of the FLSA as they have been named as defendants in numerous similar lawsuits, including a similar nationwide collective action brought against Domino's Pizza, LLC over a decade ago. *See e.g. Luiken v. Domino's Pizza, LLC*, Case No. 0:09-cv-00516 (D. Minnesota).

228.    Defendants have willfully violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206.

229.    Plaintiff and the Delivery Expenses Collective have been damaged by Defendants' willful failure to pay minimum wage as required by law.

230.    As a result of Defendants' violations of the FLSA, Plaintiff and the Delivery Expenses Collective, are entitled to all unpaid minimum wages to be proven at trial, an additional amount equal to all such unpaid minimum wages as liquidated damages, reasonable attorneys' fees, and costs.

### Count 2
### Fair Labor Standards Act – Overtime Violation
### On behalf of Plaintiff and the Delivery Expenses Collective

231.    Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

232.    Plaintiff and the Delivery Expenses Collective are or were non-exempt, hourly employees entitled to receive no less than minimum wage for all hours worked.

233.    Plaintiff and other members of the Delivery Expenses Collective worked in excess of forty hours in a given workweek thereby requiring Defendants to pay Plaintiff and other members of the Delivery Expenses Collective one-and-one-half times their regular rate of pay for all such hours worked.

234.    The overtime wage requirements of the FLSA will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically

required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or **overtime wages**. 29 C.F.R. § 531.35 (emphasis added).

235.     It is well established that, in the pizza delivery context, employers have two options to comply with the overtime wage directives of the FLSA: either (1) keep records of delivery drivers' actual expenses and reimburse for them or (2) reimburse drivers at the IRS standard business mileage rate." *Hatmaker*, 2019 WL 5725043, *3 citing DOL Field Operations Handbook 30c15.

236.     At all relevant times, Plaintiff and the Delivery Expenses Collective were required to provide their own vehicle to deliver Defendants' pizzas and related food products and beverages.

237.     At all relevant times, Defendants never kept track of the actual vehicle related expenses incurred by Plaintiff and the Delivery Expenses Collective.

238.     At all relevant times, Defendants suffered or permitted Plaintiff and the Delivery Expenses Collective to receive a flat rate per delivery reimbursement which is often as little as $1.00 per delivery.

239.     At all relevant times, Defendants suffered or permitted Plaintiff and the Delivery Expenses Collective to purchase Domino's branded apparel for the purpose of complying with Defendants' enterprise-wide attire and appearance policy.

240.     At all relevant times, Defendants did so while also suffering or permitting Plaintiff and other members of the Delivery Expenses Collective more than forty hours in a given workweek.

241.     As a result of the forgoing actions, Defendants have violated the overtime wage provisions of the FLSA, 29 U.S.C § 207(a).

242.     Defendants are well aware of the overtime wage requirements of the FLSA as they have been named as defendants in numerous similar lawsuits, including a similar nationwide collective action brought against Domino's Pizza, LLC over a decade ago. *See e.g. Luiken v. Domino's Pizza, LLC*, Case No. 0:09-cv-00516 (D. Minnesota).

243.     Defendants have willfully violated the minimum wage provisions of the FLSA, 29 U.S.C. § 207(a).

244.     Plaintiff and the Delivery Expenses Collective have been damaged by Defendants' willful failure to pay overtime wages as required by law.

245.     As a result of Defendants' violations of the FLSA, Plaintiff and the Delivery Expenses Collective, are entitled to all unpaid overtime wages to be proven at trial, an additional amount equal to all such unpaid overtime wages as liquidated damages, reasonable attorneys' fees, and costs.

<u>**Count Three**</u>
**Fair Labor Standards Act – Minimum Wage Violation**
**On behalf of Plaintiff and the Tip Credit Collective**

246.     Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

247.     According to the Department of Labor's ("DOL") Fact Sheet #15: Tipped Employees Under the Fair Labor Standards Act (FLSA) ("Fact Sheet #15"):

> the maximum tip credit that an employer can currently claim under the FLSA is $5.12 per hour (the minimum wage of $7.25 minus the minimum required cash wage of $2.13).

248.     As is made plain in Fact Sheet #15, in order to claim a tip credit, the employer must comply with five strict notification requirements.

249.    First, the employer must notify the employee of the amount of the cash wage the employer is paying the tipped employee and that amount must equal at least $2.13 per hour.

250.    Second, the employer must notify the tipped employee of the amount the employer is claiming as a tip credit. In accordance with the FLSA, the tip credit claimed cannot exceed $5.12 per hour.

251.    Third, the employer must inform the tipped employee that the tip credit claimed cannot exceed the actual amount of tips received by the employee. In effect, the employer must inform the employee that the employee must still earn the mandated minimum of $7.25 per hour between the amount of the tip credit taken by the employer and the amount of tips earned by the employee.

252.    Fourth, the employer must notify the tipped employee that all tips received are to be retained by the employee except for a valid tip pooling arrangement.

253.    Finally, the tipped employee must be informed by the employer that the tip credit will not apply unless the employee has been informed of these provisions.

254.    Further, where a tipped employee earns less in tips than the tip credit claimed, the employer is required to make up the difference. Stated another way, if a tipped employee earns less than $5.12 per hour in tips (the maximum tip credit permissible where the employer pays the employee $2.13 per hour), the employer must raise that tipped employee's hourly cash component the necessary amount above $2.13 per hour so as to ensure that the employee earns at least $7.25 per hour – the mandated minimum wage.

255.    At all relevant times, Defendants failed to insure that Plaintiff and the Tip Credit Collective were properly notified and informed of all of the legal requirements which must be met in order to take a tip credit against delivery drivers' wages.

256.     Despite Plaintiff and the Tip Credit Collective earning less than federal or state minimum wage, Defendants did not inform Plaintiff and the Tip Credit Collective that as tipped employees, their cash wage must be equal to at least $2.13 per hour.

257.     Despite Plaintiff and the Tip Credit Collective earning less than federal or state minimum wage, Defendants did not inform Plaintiff and the Tip Credit Collective that Defendants will be taking a tip credit against their wages not to exceed $5.12 per hour.

258.     Despite Plaintiff and the Tip Credit Collective earning less than federal or state minimum wage, Defendants did not inform Plaintiff and the Tip Credit Collective that the tip credit claimed cannot exceed the actual amount of tips received by the employee. Defendants did not inform Plaintiff and the Tip Credit Collective that they must still earn the mandated minimum of $7.25 per hour between the amount of the tip credit taken by the employer and the amount of tips earned by the employee.

259.     Despite Plaintiff and the Tip Credit Collective earning less than federal or state minimum wage, Defendants did not inform Plaintiff and the Tip Credit Collective that all tips received are to be retained by the employee except for a valid tip pooling arrangement.

260.     Despite Plaintiff and the Tip Credit Collective earning less than federal or state minimum wage, Defendants did not inform Plaintiff and the Tip Credit Collective that the tip credit will not apply unless the employee has been informed of these provisions.

261.     Moreover, by making Plaintiff and the Tip Credit Collective pay for job-related expenses as described herein, Domino's did not ensure that Plaintiff and the Tip Credit Collective retain all of their tips, thereby forfeiting Domino's ability to take a tip credit against Plaintiff and the Tip Credit Collective's wages.

262. As a result, Defendants have violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206.

263. Defendants are well aware of the minimum wage and overtime requirements of the FLSA as they have been named as defendants in numerous similar lawsuits, including a similar nationwide collective action brought against Domino's Pizza, LLC over a decade ago. *See e.g. Luiken v. Domino's Pizza, LLC*, Case No. 0:09-cv-00516 (D. Minnesota).

264. As such, Defendants have willfully violated the minimum wage provisions of the FLSA, 29 U.S.C. § 206.

265. As a result of Defendants' violations of the FLSA, Plaintiff and the Tip Credit Collective, are entitled to all unpaid minimum wages to be proven at trial, an additional amount equal to all such unpaid minimum wages as liquidated damages, reasonable attorneys' fees, and costs.

### Count Four
### Fair Labor Standards Act – Overtime Violation
### On behalf of Plaintiff and the Tip Credit Collective

266. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

267. Defendants took a tip credit against Plaintiff's and the Tip Credit Collectives overtime wages, i.e. any hours that Plaintiff and the Tip Credit worked exceeding forty hours in a given workweek.

268. The tip credit may also be applied to an employer's overtime obligations. *See* 29 C.F.R. § 531.60. "To illustrate how this works, an employee working overtime must be paid $10.88 per hour—one and one-half times $7.25." *E.g. Tom v. Hospitality Ventures LLC*, 980 F.3d 1027,

1033 (4th Cir. 2020). "The employer can still use the $5.12 tip credit but not more, meaning the hourly wage for overtime must be $5.76- $10.88 minus a $5.12 tip credit." *Id.*

269.     As detailed above, Defendants did not give Plaintiff and the Tip Credit Collective proper notice of all of the legal requirements to taking a tip credit prior to taking the same. Nevertheless, Defendants took a tip credit against Plaintiff's and the Tip Credit Collective's overtime wages when Defendants were not permitted to do so.

270.     Moreover, by making Plaintiff and the Tip Credit Collecitve pay for job-related expenses as described herein, Defendants not ensure that its delivery drivers retain all of their tips, thereby forfeiting Defendant's ability to take a tip credit against the overtime wages due to Plaintiff and the Tip Credit Collective.

271.     As a result, Defendants have violated the overtime provisions of the FLSA, 29 U.S.C. § 207(a).

272.     Defendants are well aware of the overtime requirements of the FLSA as they have been named as defendants in numerous similar lawsuits, including a similar nationwide collective action brought against Domino's Pizza, LLC over a decade ago. *See e.g. Luiken v. Domino's Pizza, LLC*, Case No. 0:09-cv-00516 (D. Minnesota).

273.     As a result of Defendants' violations of the FLSA, Plaintiff and the Tip Credit Collective, are entitled to all unpaid overtime wages to be proven at trial, an additional amount equal to all such unpaid overtime wages as liquidated damages, reasonable attorneys' fees, and costs.

**WHEREFORE**, Plaintiff Sarah Bryant prays for all of the following relief:

A.     Designation of this action as a collective action on behalf of the Expense Reimbursement Collective and the Tip Credit Collective and prompt issuance of notice to all

similarly-situated members of an opt-in class, apprising them of this action, permitting them to assert timely wage and hour claims in this action, and appointment of Plaintiff and their counsel to represent the collective action members.

B.      Unpaid minimum and overtime wages, reimbursement of expenses, unlawful deductions and an additional and equal amount as liquidated damages pursuant to the FLSA and supporting regulations;

C.      An award of prejudgment and post-judgment interest.

D.      An award of costs and expenses of this action, together with reasonable attorneys' fees and expert fees.

E.      A service award to Plaintiff in recognition of her efforts on behalf of the Collective.

F.      Such other legal and equitable relief as the Court deems appropriate.

Respectfully submitted,

/s/      *James L. Simon*
James L. Simon
Law Offices of Simon & Simon
5000 Rockside Road
Liberty Plaza – Suite 520
Independence, Ohio
Phone: (216) 525-8890
Email: james@bswages.com

/s/      *Michael L. Fradin*
Michael L. Fradin
The Law Office of Michael L. Fradin
8401 Crawford Ave. Ste. 104
Skokie, IL 60076
Phone: 847-644-3425
Fax: 847-673-1228
Email: mike@fradinlaw.com

*Counsel for Plaintiff and the Putative Collective*

42

## **JURY DEMAND**

Plaintiff hereby demands a jury trial by the maximum persons permitted by law on all issues herein triable to a jury.

/s/ _James L. Simon_